# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### BEAUMONT DIVISION

**Alan Trojcak Reg. No. 06311-078**          **CIVIL ACTION NO. _____**

**Andre Ford   Reg. No.  29802-177**

**Bennie Steptoe  Reg. No. 88650-079**

**Carlos Romero   Reg. No. 12727-064**

**Austin Demetrius Reg. No.  51607-019**

**Donald Givens  Reg. No.  28525-180**

**Douglas Fusilier  Reg. No.  97592-079**

**Edward Hubbard Reg. No.  13634-179**

**Elluard Jackson   Reg. No.  69292-079**

**Eric Hampton  Reg. No.  72874-079**

**Floyd Richard Reg. No.  06574-078**

**Fredrick Jackson   Reg. No.  91854-080**

**David Sostre   Reg. No.  40014-018**

**Jimmy Skinner  Reg. No.   31441-077**

**Johnny Calderon Reg. No.  57114-080**

**Juan Castro   Reg. No.  98524-079**

**Juan Cisneros  Reg. No.  40178-079**

**Larry Callum  Reg. No.  48858-080**

**Louis Mayer  Reg. No.  97437-079**

**Luis Sicard      Reg. No.  87846-079**

**Mitchell Foxworth Reg. No.  09376-026**

**Pablo Brito   Reg. No.  64441-080**

**Roland Samaniego  Reg. No.  43425-180**

**Ronald Simmons  Reg. No.  06188-043**

**Terrick Durham  Reg. No.  31336-179**

**Tibursio Martinez  Reg. No.  16116-047**

**Tony Anderson   Reg. No.  30126-077**

**Victor Valencia  Reg. No.  25649-034**

**Willie Harmon  Reg. No. 04749-078**
F.C.I. Beaumont Medium
P.O. Box 26040
Beaumont, Texas  77720

**Brian Johnson  Reg. No. 27814-034**

**Eric McPherson  Reg. No.  24919-086**

**Gene Williamson  Reg. No.  83620-079**

**Wilson Moreno  Reg. No.  83480-079**

**Michael Hodges  Reg. No. 27884-034**
F.C.I. Beaumont Low
P.O. Box 26020
Beaumont, Texas  77720

**Alberto Alaniz  Jr.  Reg. No. 08779-045**

F.C.I. Milan Low
P.O. Box. 1000
Milan, Michigan 48160

**Nazanzo Hill  Reg. No.  03015-180**

**George Salinas  Reg. No.  12627-179**

**Arturo Apaez  Reg. No. 13816-179**
F.C.I. Bastrop Low
P.O. Box 1010
Bastrop, Texas  78602

**Benjamin Stone  Reg. No. 84453-080**
F.C.I.  El Reno Medium
P.O. Box 1500
El Reno, Oklahoma  73036

**Charles Douglas  Reg,  No. 59931-079**
Houston CCM Community Corrections Office
515 Rusk,  Room  12102
Houston, Texas  77002

**Charles Ross Jr.   Reg. No. 10626-035**
Forrest City Medium
P.O. Box 3000
Forrest City, Arkansas  72336

**Daniel Anderson  Reg. No.  11633-052**
Brooklyn Metropolitan Detention Center
P.O. Box 329002
Brooklyn, N. Y.  11232

**Darrell Mask  Reg. No.  08536-078**
F.C.I. Low Texarkana
P.O. Box 7000
Texarkana, Texas  75505

**Oscar Martinez  Reg. No.  26438-179**
Oklahoma City Federal Transfer Center

P.O. Box 898801
Oklahoma City, Oklahoma  73189

**Raul Reyna- Rodriguez Reg. No. 13579-179**
Big Spring Correctional Center / Flightline Unit
2001  Rickabaugh Drive
Big Spring, Texas  79720

**Terry Estes  Reg. No.  35537-180**
F.C.I. Manchester Medium
P.O. Box 4000
Manchester, Ky.  40962

**Cornelius Bell Reg. No. 08869-078**
3505 Stone Road
Kilgore, Texas   75662

*Plaintiffs,*

vs.

**UNITED STATES OF AMERICA**

*Defendant.*

## PLAINTIFFS ORIGINAL COMPLAINT

On behalf of themselves, Plaintiffs [hereafter *Claimants* or *Plaintiffs*],

acting through counsel, state the following complaint against Defendant:

### Jurisdiction and Venue

1.    Jurisdiction is conferred upon this court by 28 U.S.C. § 1331

which authorizes federal courts to decide cases concerning federal questions.

2. Venue is proper in this Court because the true party in interest is an agency of the United States, to wit the Federal Bureau of Prisons. Pursuant to 28 U.S.C. § 1391 (e) (2), a civil action may be brought in any judicial district in which a substantial part of the event or omissions giving rise to the claim occurred. All of these events and omissions took place at the Federal Correctional Complex at Beaumont, Texas on Knauth Road, Beaumont, Texas 77705, thus satisfying the venue criteria for 28 U.S.C. § 1391 (e)(2).

**Applicable Federal Statutes**

3. Plaintiffs bring this action against the United States under the Federal Tort Claims Act, in accordance with 28 U.S.C. § 1346 (b)(2).

4. At all times material to the events referenced hereafter, the individual employees and agents of the Federal Government were acting within the scope of their employment as defined in 28 U.S.C. § 2671.

5. All plaintiffs were inmates living at the Beaumont Federal Correctional Institution Medium. All plaintiffs have presented a prior showing of physical injury in accordance with 28 U.S.C. § 1346(b), compounded by both mental and emotional injuries which are inextricably intertwined with these physical injuries. All plaintiffs point to a common source for these physical and mental injuries, namely coerced labor requiring 12 hour days, running seven days a week, coupled with close and prolonged

proximity and repeated over exposure to hazardous products at a UNICOR factory, further exacerbated by living in a condemned building with only contaminated and unsafe water to drink. The physical deprivations suffered and the resulting injuries are of such a nature that these physical and mental injuries will be lingering and will persist for a long period of time

6. If the United States were a private party, it would be liable to Plaintiffs for acts and omissions of its employees and agents under the law of the place where said acts and omissions occurred, to wit in the State of Texas under common law tort claims for: (1) negligence, (2) coercion; (3) reckless disregard for another's welfare or deliberate indifference, (4) malice and (5) cruel and unusual punishment as a constitutional tort.

**The Parties**

7. Pursuant to 28 U.S.C. § 2675(a), administrative remedies must be exhausted before seeking relief in a U.S. District Court. If an administrative claim is denied, a lawsuit must be commenced in six months.

8. There are 47 claimants that have exhausted their administrative remedies. Less than six months has elapsed since these claims were denied. Accordingly, this Court has jurisdiction to decide these claims.

9. All claimants are wards of the Federal Bureau of Prisons, housed at the Beaumont Federal Correctional Institution Medium. Claimants are also

employees of a prison industry called UNICOR, which is a self-sustaining corporation established to create a real world work environment for inmates.

10. Claimants were present when Hurricane Rita landed on September 25, 2008. In the next 4 to 10 days, claimants were evacuated to other federal prisons. On or about November 7th, and again on November 18th, 2005, the first claimants were first brought back to Beaumont Medium against their wills. The remaining claimants returned in late November and December of 2005. This occurred 5 and 6 months before the Beaumont Medium prison was repaired to the point that it could pass an inspection conducted by the Federal Bureau of Prison's Regional Office in Dallas – Fort Worth and once again serve as a prison. All material events set forth in this Complaint took place between November of 2005 and extended to February of 2006, before the Medium prison in Beaumont could pass an inspection.

11. Defendant is the Unites States Government, under whose auspices both the Beaumont Federal Correctional Institution Medium prison in Beaumont and the UNICOR factory associated with this prison, operate.

### Allegations Common to all Claims

12. The Beaumont Federal Correctional Institution Medium is operated by the Federal Bureau of Prisons and, like every other federal adult prison, it is accredited by the American Correctional Association and it has

embraced standards in Program Statements set by the American Correctional Association. Bureau of Prison Director Harley Lappin sits on the American Correctional Association's Standards Committee, which establishes standards for the accreditation of correctional institutions nationally.

13.  Beaumont Federal Correctional Institution Medium at Beaumont is subject to the American Correctional Association standards and it is regularly audited to insure that it maintains these standards.

14. The Beaumont Federal Correctional Institution Medium operates a UNICOR factory which manufactures the PASGT Kevlar [hereafter *Kevlar*] military helmet for the U.S. Department of Defense [a/k/a *military*].

15. American Correctional Association Standard 3-4401 states:

> "Written policy, procedure and practice provide that all institutional work, industry and vocational education programs must meet minimum applicable federal, state or local work, health and safety standards. There is documentation that the programs are inspected by federal state or local health and safety officials at least annually. The programs are also inspected weekly by qualified departmental staff and monthly by a safety officer."

16. The written policy of the Federal Bureau of Prisons implementing the above Standard is attached as Exhibit 1 and, in relevant part, states:

> "3. Operating machinery without use of safety guard(s) as provided is forbidden and subject to disciplinary action.
>
> 5. To protect against physical injury and / or health hazard, each inmate worker is required to use all safety

equipment provided. Personal protective equipment such as hard hats, hearing protection, goggles, respirators, aprons, arm guards, wire mesh gloves and safety shoes are to be used in designated areas and <u>must</u> be worn in the proper manner. [Emphasis in original text.]

6. Safety goggles must be worn when performing any grinding, chiseling, filing or sanding operation. Landscape operations involving the operation of weed eaters or edgers also require the use of safety goggles.

11. Safety hazards are to be reported to your work supervisor immediately. If the work supervisor does not agree that an unsafe condition exists, you are to report the unsafe condition to the institution's Safety Manager for further consideration."

17. American Correctional Association Standard 3-4404 states:

"Written policy, procedure, and practice provide that the number of inmates assigned to industries operations meet the realistic workload needs of each industries operating unit."

18. On September 25, 2005, the Federal Prison Complex at Beaumont was struck by the eye of Hurricane Rita. As the hurricane approached, the first building struck was the Medium prison. This means it was the first to be rocked by airborne debris carried from locations beyond the prison complex.

19. At the eye of the hurricane, where winds are the most intense, the Medium prison was struck by sustained winds averaging 125 miles an hour or more. At this speed, the force of these winds equals 1,250 pounds per square inch or roughly the weight of 32 concrete building blocks slamming against *each square inch* of wall and glass window encountered.

20. Prison staff was not prepared for this hurricane and its devastating effects. The prison lost its electricity and there was no back-up source of power. Immediately, the prison could no longer run its ventilation and air conditioning system. Plumbing became nonfunctional. Plastic bags had to be issued for the urine and feces of prisoners. Water became contaminated.

21. Outside, the temperatures hovered above 90 degrees. Inside these cells, the temperature was between 100 and 110 degrees. As one claimant described, the heat was unbearable, there was no sanitary drinking water, severe hydration, overpowering stench from body waste with no possibility of showering or getting a clean set of sheets or even fresh clothing.

22. To avoid suffering from dehydration, every occupant of the Medium prison had to drink large quantities of contaminated drinking water. This continued until they were finally evacuated, in some cases for a week.

23. Once inmates were evacuated, the edifice left standing was a condemned building in every sense of the term. The Medium prison was unsuitable for human habitation and for use as a functioning prison. The perimeter fence was either gone or on the ground, large parts of the roof were blown away, electricity and plumbing were non-existent, water damage was extensive throughout the interior and, along with this water damage, the hurricane left interior walls extensively infested with Black Mold.

24.   Claimants were evacuated to Federal prisons at Leavenworth, Kansas, Bennettsville and Williamsburg, South Carolina and other prisons.

25. For the last week of September, all of October and the first week of November, 2005, not a single Kevlar helmet was manufactured at the UNICOR factory in the Beaumont Federal Correctional Institution Medium.

26. UNICOR is the sole source supplier to the Department of Defense for the Kevlar military helmet.  The order for Kevlar helmets is placed by the *Defense Supply Center Philadelphia*, an entity operating under the Department of Defense's *Defense Logistics Agency*. In its website, the *Defense Supply Center Philadelphia* prides itself on *transitions from managing items to managing the supply chain.*

27. The order from the *Defense Supply Center Philadelphia* is placed with UNICOR's Central Office at 320 First Street, N.W., Washington, D.C. 20534, which is also the Central Office address for the Federal Bureau of Prisons. Within UNICOR, the administration of this order for Kevlar helmets is placed with the *Electronics Mfg. and Plastics Program.*

28. Upon information and belief, in the course of monitoring the supply chain for Kevlar helmets, the *Defense Supply Center Philadelphia* became aware of a shortage sometime in October or early November. Given the events which unfolded in November and December of 2005, a flash point

was obviously reached and enormous pressure was soon applied by the *Defense Supply Center Philadelphia* to UNICOR's *Electronics Mfg. and Plastics Program* in Washington, D.C. This is the only plausible explanation for an extraordinary sequence of events which unraveled thereafter in Texas.

**Transfer Back to Beaumont Medium and Daily Work Schedule**

29.    Claimants were first ordered back to Beaumont Federal Correctional Institution Medium on November 8, 2005. After just surviving a hurricane, followed by 4 to 10 days of being forced to drink contaminated water and living in the stench of their own body waste, none of these claimants wanted to return. In every case, claimants were told that they had no choice. They were compelled to return. They arrived by bus and by plane.

30. Claimants were taken to cells in the least damaged K/A Unit, still left filthy from its earlier departed occupants who, like themselves, had to endure a hurricane's ravages until evacuated. Claimants arrived late at night, sometimes after 11 p.m. They were given no cleaning supplies and their own supplies were still in transit. They were told that they would be woken up at 6 a.m. the next day and left to sleep on a filthy mat containing the dried up sweat and dirt of an unknown earlier occupant. Hygiene and sanitation was nonexistent. K/A Unit sustained roof leaks, exposed wires, water damage and extensive mold. It was the least damaged but far from being undamaged.

31. American Correctional Association Standard 3-4317 states:

"Written policy, procedure, and practice provide for the issue of suitable clothing to all inmates. Clothing is properly fitted, climactically suitable, durable, and presentable."

32. Clothing was issued to claimants at random from the Laundry. In most cases, the clothing either did not fit or, if it could be worn, the fitting was such that it made a person's appearance look comical.

33. When claimants awoke at 6 a.m. and left K/A Unit, they noticed signs informing guards that the water was not safe to be drunk. Despite this warning, claimants had to drink, wash, cook and bath in this contaminated water. They only received one small bottle of sanitary water each day.

34. From the Medium prison, they went to the Chow Hall, where they were bluntly told by Warden Morse, Superintendent of Industries Hollingsworth and others, that they were brought back to complete a million dollar UNICOR contract and nothing else. They would not get recreation time, no law library time, no time to do anything but work at UNICOR.

35. Claimants were further told that if they did not want to work, they would go to the Special Housing Unit (i.e. the *hole*). The *hole* consisted of a 23 hour lockdown, and carried the possibility of losing earned good time, which was equivalent to postponing their projected releases and keeping them in prison longer. Under coercion and duress, claimants agreed to work.

36. The Chow Hall floor was covered with water which dripped from gaping holes in the ceiling. After eating breakfast, claimants were taken to the UNICOR factory by 7:30 a.m..

37. Claimants returning on November 8, 2005 re-opened the UNICOR factory. After a lunch break, their 8 hour shift ended at 3:30 p.m. Claimants were compelled to work overtime.

38. In the first weeks of November, they worked 14 hour days, 7 days a week. In late November and the first half of December, the shifts went 12 hours, for 10 or 12 straight days before getting a day off. For the most part through November and December, 2005, claimants worked from 7:30 a.m. until 9 p.m. at night. Around Christmas, production was finally brought current and they were given a few days off for the holidays.

39. While they worked, claimants were constantly ridiculed, tormented and yelled at because of deadlines on million dollar contracts.  If they faltered, they were told in no uncertain terms that they would be taken to the *hole*.  Duress and coercion were unrelenting and ubiquitous.

40. Claimants were forced to work at an accelerated pace. They were pushed to make as many helmets as possible. The production from these hundred or so workers in two months was equal to the output of a work force more than double their size working normal eight hour shifts.

41. In return, Claimants were paid $1.00 an hour for regular time and $2.00 an hour for overtime.

42. Asking for medical attention or reporting to sick call was not an option. The medical area of the prison was badly damaged by water and totally infested with black mold on its walls, running from the doctor offices to the examining rooms. The medical care part of the prison was shut down.

43. At the end of the work day, they would come back to their cells with sore and aching feet, blisters on their hands and exposed parts of their skin, feeling totally exhausted and in many cases, traumatized by the ordeal.

44. American Correctional Association Standard 3-4400 states:

> "Written policy, procedure, and practice provide that the inmate workday approximates the workday in the community."

The normal workday does not approximate getting woken at 6 a.m. and ordered to work until 9 p.m. seven days a week, with an hour or less of personal time. This standard has been deliberately and recklessly violated.

45. American Correctional Association Standard 3-4134 states:

> "Inmates have access to operable showers with temperature-controlled hot and cold running water at a minimum ratio of one shower for every eight inmates. Water for showers is thermostatically controlled to temperatures ranging from 100 Fahrenheit to 120 Fahrenheit to ensure the safety of inmates and to promote hygienic practices."

In support, the American Correctional Association's comment reads, "…Water temperatures below 100 Fahrenheit are uncomfortable and may deter an individual from pursuing good hygienic practices. …"

46. There was no hot water in the showers of the K/A Unit and the water coming out felt ice cold. After working a 12 hour shift and being on their legs all day, this shower was just added punishment. The cold water also did nothing to promote hygiene and sanitation.

47. In addition to cold temperatures, water from the showerhead had a brown color to it and the shower ceiling had leaks in the roof. You would feel water coming from the ceiling and roof as well as the showerhead.

48. Lights were off at 10 p.m. Claimants were given an hour or less to take a shower and tend to any personal matters before they went to bed.

49. The Beaumont Federal Correctional Institution Medium did not re-open and begin to repopulate until April of 2006. It was not until March of 2006 that sufficient repairs could be made to pass an inspection. The most severe state of disrepair occurred in November and December of 2005, and it gradually improved thereafter. The actionable span of time set forth in these tort claims is from November 8, 2005 to the end of February, 2006. During this time period, this prison was closed because it could not pass an inspection. Moving claimants before it reopened in April violated *every rule*.

## UNICOR Factory Operations and Materials

50. The UNICOR factory manufacturing these Kevlar helmets has 12 press machines that run at temperatures of about 175 degrees. In the interior spaces, there is no vapor control and there is no ventilation. Heat build-up in summer, due to the temperatures given off by the presses, often exceeds 100 degrees because the hot air has no where to escape.

51. To make a Kelvar military helmet, the following products are used in the production process:

(1) DuPont Kevlar Fibers**;**
(2) Sherwin-Williams Kem Aqua Hydralon B, high gloss waterborne topcoat (Chemical Warfare Resistant Coating);
(3) Sherwin-Williams MIL-DTL-64159 Type I Chemical Resistant Coating;
(4) 3M Fastbond Contact Adhesive 30-NF Green;
(5) 3M Acryl-Green Spot Putty 05960;
(6) Solarez Polyester Laminating Resin;

52. American Correctional Association Standard 3-4318 states:

"Written policy, procedure, and practice provide for the issue of special and, when appropriate, protective clothing and equipment to inmates assigned to the institution's food service, hospital, farm, garage, physical plant maintenance shops, *and other special work details.*"  [Emphasis added.]

In support, the American Correctional Association's comment reads, "Inmates assigned to special work areas should be clothed in accordance with the requirements of their work assignment and, when appropriate, be furnished

with suitable protective equipment (disposable face masks and gloves, protective helmets, goggles, etc.)."

53. Every one of the above mentioned products used for manufacturing these helmets either contained hazardous ingredients or, in processing, it could release hazardous vapors, mists and harmful solid matter, necessitating safety apparel. Claimants were not issued protective clothing calculated to protect them from harmful vapors, mists and inhalation of microscopic solid matter.

54. Processing and handling of Kevlar fibers can produce airborne respirable fibrils. The product's material safety data sheet recommends using ventilation or a respirator to minimize fibril inhalation. Over exposure and long term exposure to high doses of respirable fibers can lead to pulmonary inflammation and subsequent development of chronic lung disease. If there is inadequate ventilation, the product's safety data sheet recommends use of an air purifying respirator with a dust / mist / fume cartridge or canister. Claimants were subjected to overexposure and to repeated long term exposure of Kevlar respirable fibrils in an unventilated area and without the recommended safety apparel. Accordingly, claimants have all inhaled respirable fibrils, and they are all at risk for contracting chronic lung disease.

55. The material safety data sheet for Sherwin Williams' Kem Aqua Hydralon B, high gloss waterborne topcoat states, "Use only with adequate

ventilation. Avoid breathing vapor or spray mist. Do not get in eyes or on skin." Two ingredients are hazardous. If ventilation is inadequate, the safety data sheet recommends a properly fitted organic vapor / particulate respirator and safety glasses with unperforated side shields. Claimants were subjected to overexposure and long term repeated exposure of this product's vapor and mist and this occurred without the recommended safety apparel.

56. The product safety data sheet for Sherwin-Williams MIL-DTL-64159 Type I Chemical Resistant coating warns against inhalation of vapor or spray mist. If this enters the upper respiratory system, it can cause headache, nausea or dizziness. It further warns, "Use only with adequate ventilation." The safety apparel recommended for this product includes a positive pressure air supplied respirator, protective gloves and safety glasses with unperforated sideshields. Claimants were subjected to overexposure and to long term repeated exposure to this product's vapor and spray mist, in an unventilated area and without the recommended safety apparel.

57. The product safety data sheet for 3M Fastbond Contact Adhesive 30-NF Green warns against eye contact, skin contact, inhalation, ingestion and prolonged and repeated exposure. The safety apparel recommended includes safety glasses with side shields, gloves or protective clothing to avoid skin contact, and a half or full face mask air purifying respirator with

organic vapor cartridges and N95 particulate prefilters.  Without this safety apparel, prolonged and repeated overexposure can cause blurred or impaired vision, hearing impairment, balance dysfunction, ringing in ears, headache, dizziness, drowsiness, incoordination, slow reaction time, slurred speech and complete loss of smell. Neurological damage may consist of personality changes, tingling and numbness in extremities, tremors, sensory loss and changes in blood pressure and heart rate. Claimants were subjected to overexposure and to repeated long term exposure to the hazardous effects of this product in an unventilated area without the recommended safety apparel.

58. The product safety data sheet for 3M Acryl-Green Spot Putty No. 05960 warns against eye contact and skin contact. It further states, "Use in a well ventilated area." The safety apparel recommended for this product includes safety glasses with side shields, gloves made from nitrile rubber, and a half mask organic vapor respirator with dust/mist prefilter, or full face organic vapor respirator with dust / mist prefilter or full face organic vapor respirator with dust/mist prefilter. Without this safety apparel, prolonged and repeated overexposure can cause kidney effects (i.e. reduced urine volume, blood in urine), back pain, liver effects (i.e. yellow skin and tender upper abdomen), central neuropathy damage (i.e. dizziness, incoordination, visual changes, emotional changes, tremors and convulsions). Claimants were

subjected to overexposure and repeated long term exposure to hazards of this product in an unventilated area, without the recommended safety apparel.

59. The product safety data sheet for Solarez Polyester Laminating Resin warns against inhaling its vapor or mist. Recommended safety apparel includes splash goggles, polyvinyl alcohol gloves and full face atmosphere supplying respirator or air purifying respirator for organic vapors if ventilation is not adequate. Without this safety apparel, prolonged and repeated overexposure can cause severe eye irritation (i.e. redness, tearing and blurred vision), moderate skin irritation, nasal and respiratory irritation, dizziness, weakness, fatigue, nausea and headache. High concentration may result in narcosis (i.e. a condition of deep stupor or unconsciousness produced by a chemical). Claimants were subjected to overexposure and to repeated long term exposure to hazardous effects of this product in an unventilated area and without the recommended safety apparel.

**Walsh – Healey Act Compliance / Non-Compliance**

60. Federal prisoners are considered employees under the Federal Fair Labor Standards Act by virtue of the fact that they are absent from the list of exemptions set forth in this law (i.e. *see* 29 U.S.C. § 213 Exemptions).[1]

---

[1] *See also* Carter v. Dutchess Community College, 735 F. 2nd 813 (2nd Cir. 1984); Woodall v. Partilla, 581 F. Supp. 1066 (N.D. Ill. 1984).

61. Federal prisoners engaged in the manufacture of commodities for use by the Federal Government under an approved inmate work program are specifically exempted from paragraph (c) of the Walsh-Healey Act, which otherwise excludes convict labor from its protections.[2] Accordingly, claimants are entitled to the protections of the Wash-Healey Act.

62. The contract between the *Defense Supply Center Philadelphia* and UNICOR's *Electronics Mfg. and Plastics Program* exceeds $10,000. A March 2003 contract is worth $5,533,080. Attached as an exhibit is a series of contracts confirming that the Walsh-Healey Act applied to these helmets.[3]

63. Paragraph (a) of the Walsh-Healey Act requires the contractor, UNICOR's *Electronics Mfg. and Plastics Program,* to pay minimum wages. This provision was violated. Claimants were paid only $1.00 an hour for regular time and $2.00 an hour for overtime.

64. Paragraph (b) of the Walsh-Healey Act requires the contractor, UNICOR's *Electronics Mfg. and Plastics Program,* to work its employees only 40 hours a week. This provision was also violated.

---

[2] *See* 18 U.S.C. § 1761 (b) stating: "This chapter shall not apply to … commodities manufactured in a Federal … institution for use by the Federal Government," and (c) which states: "In addition to the exceptions set forth in subsection (b) of this section…" The Walsh-Healey Act states: "… no convict labor will be employed by the contractor …except that this section … shall not apply to convict labor which satisfies the conditions of section 1761(c) of Title 18."  UNICOR comes within this Walsh-Healey exemption because it is referenced in both paragraphs (b) *and* (c) of 18 U.S.C. § 1761.

[3] *See* Exhibit 2, UNICOR contracts awarded and confirming how Walsh-Healey applies.

65. Paragraph (d) of the Walsh-Healey Act requires the contractor, UNICOR's *Electronics Mfg. and Plastics Program,* to certify that no part of such contract will be performed under working conditions which are unsanitary or hazardous or dangerous to the health and safety of employees. This provision was violated in ways that are shocking to the conscience.

66. It is incontrovertible that the terms of the Walsh-Healey Act apply to this contract and all of these provisions were violated. Notwithstanding this overt conduct, Defendant's UNICOR supervisors certified compliance with Walsh-Healey Act provisions to the U.S. Department of Defense.

**Physical Injuries**

67. Morgellons disease is a skin disorder characterized by disfiguring sores and crawling sensations on and under the skin. From these severe skin sores, strange fibers are "growing" or protruding out of the sores. There is strong data indicating that this disorder is assciated with nanotechnology, which refers to applied science involving the control of matter on an atomic or molecular scale. The outer casing of its fiber specimen is made of high density polyethylene, the same material used for fiber optics. Morgellons disease was unknown prior to Hurricane Rita. Chevron Chemical's ethylene plant in Port Arthur, Texas manufactures this material, which was caught in Hurricane Rita's storm surge and transported inland, contaminating water.

68. Symptoms of Morgellons disease include skin rashes or sores accompanied by intense itching; threads, fibers, or black speck-like materials beneath the skin; crawling sensations on and under the skin akin to tiny worms, sometimes with biting and stinging sensations. There are also mental symptoms including inability to concentrate and difficulty with short-term memory. There is also joint and muscle pain, changes in vision, mental confusion, fatigue and changes in skin texture and color.

69. There is presently no cure for Morgellons disease. The man-made fibers are immune to antibodies and similar remedies. The high density casing will not burn until temperatures reach 1750 degrees Fahrenheit. Many claimants are experiencing *all* of the symptoms of Morgellons disease.

70. Stachybotrys Chartarum, referred to as *black mold*, entered the prison through the roof, through window calking and by way of ventilation ducts. Claimants lived in close proximity and suffered long term exposure to this mold, making inhaling of its harmful spores virtually unavoidable.

71. Symptoms of black mold include shortness of breath, breathing problems, tightness in chest, chronic fatigue, watery and reddened eyes, memory problems, mood swings and skin sores in areas subject to perspiration. Once this mold becomes rooted in the respiratory track or the lungs, it is almost impossible to dislodge and results in chronic, typically

irreversible lung damage and attendant physical limitations caused by an impaired ability to breath. Claimants are experiencing all of these symptoms.

72. MRSA Staph is a highly contagious bacterium that spreads by contact. It could have been picked up from one of the filthy mats used by a prior occupant of the cell. Symptoms include pimples or boils, red pus filled skin sores, shortness of breath, fever and chills and urinary track problems. If MRSA Staph is not diagnosed and treated at the outset, it can spread quickly and become life threatening, particularly when it is drilling holes in the lungs and poisoning the bloodstream. Claimants are experiencing all of these symptoms and there was no medical care available to treat this disease. Furthermore, these symptoms did not arise prior to Hurricane Rita's arrival.

73. H. pylori (i.e. helicobacter pylori) is a bacteria that infects the stomach's lining. It is caught by ingesting feces. Many people have h. pylori and typically this disease is harmless. When the bacterial infection becomes deeply embedded, it can cause these symptoms; a bloated feeling after a small meal, excessive gas or burping, a change in appetite with weight loss, nausea, bloody diarrhea, and pain in the abdomen which goes away when you eat or drink. Claimants are experiencing all of these symptoms from h pylori and these symptoms did not exist before they were forced to drink contaminated water. If not treated, H pylori can cause stomach ulcers and

stomach cancers. Many claimants are at risk of contracting stomach ulcers and stomach cancer after being forced to drink contaminated water for a prolonged period of time with no access to medical care.

74. Respiratory problems can result from breathing and re-breathing air containing hazardous industrial chemicals. Claimants were overexposed and repeatedly exposed to hazardous vapors, mists and airborne solid matter that can cause long term breathing and lung problems and, in some cases, neurological damage. Many claimants are experiencing these symptoms.

75. Claimants suffered from high stress. When the hippocampus portion of our brain is subjected to large amounts of stress, a hormone called glucocorticiods is released throughout the body. The daily loading of enormous stress for a prolonged and uninterrupted period of time releases this hormone and, in the process the memory storing function performed by the hippocampus portion of the brain is damaged and impaired, leading to loss of memory. Claimants are all at risk of memory loss due to the extended period of high stress to which they were all subjected.

76. *Sleep Deprivation* will severely impair the human body's ability to metabolize glucose, which can lead to early-stage Diabetes Type 2. Lack of sleep will also cause blurred vision, impaired motor skills and irritability. All of these physical and behavior impairments were widely experienced.

**Mental Injuries**

77. The mental strain caused by this ordeal has left indelible scars upon claimants that are instantly triggered by the smallest reminders. Claimants have experienced depression, lack of self esteem and insomnia as a direct result of this ordeal. These mental states are manifested in a reduced ability to function, a higher incidence of diabetes 2 and abandonment issues.

78. Upon information and belief, additional mental illnesses are expected to become apparent during the course of discovery, and these mental illnesses are hereby incorporated by reference as if fully printed here.

**Obstructing Access to Courts**

79. Defendant's agents were well aware of their tortious conduct. They clearly threatened and, in some cases, actually retaliated against claimants for filing a tort claim. Overt sanctions consisted of baring them from continuing to work overtime. More subtle forms of retaliation consisted of taking them off a desirable job and moving them to a more stressful task.

80. For those that braved these threats and filed a tort claim anyway, they received a denial decision from the Regional Counsel. These letters are designed to do more than just deny them administrative relief. The claim is characterized as frivolous and the tone of the letter is such, it is calculated to

discourage claimants and cause them as well as others from pursuing these tort claims. This is precisely the result achieved.

81. Once denial letters were issued and began circulating through the prison, the sacrifices made to pursue these claims no longer seemed worthwhile, given the attitude reflected in these denial decisions.

82. As late as October of 2007, with only a month before the two year statute of limitation would toll, not one tort claim had been pursued. These tort filings only became possible once counsel was able to become involved and do the Form 95's for them.

### Claim 1 – Negligence

83. The elements of negligence include: (1) Plaintiff must show that Defendant owed them a duty of care; (2) the Defendant breached that duty of care; (3) Plaintiffs suffered damages and (4) Defendants' breach was the proximate cause of Plaintiffs' damages.

84. The existence of a duty is question of law to be decided from facts surrounding the occurrence in question. Pursuant to 18 U.S.C. §  4042 (a)(2), titled *Duties of Bureau of Prisons*, Defendant has a duty to provide *suitable quarters*, and provide for *the safekeeping, care and subsistence* of all persons held in custody by the Federal Bureau of Prisons. This duty of care is further defined in the standards of the American Correctional Association.

85. A condemned building is not *suitable quarters* within the meaning of 18 U.S.C. § 4042 (a)(2). Compelling claimants to drink contaminated water with brown matter floating violates the duty of Defendants to provide for their *care* and *safekeeping*.  A number of mandatory standards set by the American Correctional Association were not followed.

86. Claimants suffered damages in the form of diseases and infections contracted from drinking this contaminated water. Defendants' movement of claimants back to Beaumont to produce military helmets is a self serving and wholly inadequate reason for compromising claimants' health and it is the sole and proximate cause of claimants' damages. As a result, Defendant is liable to claimants for negligence.

## Claim 2 – Walsh – Healey Act Violations

87. Claimants are covered by protections in the Walsh – Healey Act. If a legislative enactment is violated by doing a prohibited act, or failing to do a required act, the interest of the individual sought to be protected by this statute has been violated. This rule is more than merely a canon of statutory interpretation. The disregard of a statute is a wrongful act and a tort. [4]

88. Under § (a) [41 U.S.C. § 35(a)] of the Walsh – Healey Act, Defendant is required to pay claimants minimum wages. In paying claimants

---

[4] *See* Kardon v. National Gypsum Co., 69 F.Supp. 512, 513 (D.C. Pa. 1946).  *See also* Vol. 2, Restatement Torts, § 286.

only $1 an hour for regular time, Defendant violated § (a) of the Walsh –
Healey Act by failing to do a required act.

89.   Under § (b) [41 U.S.C. § 35(b)] of the Walsh – Healey Act,
Defendant is prohibited from requiring claimants to work in excess of forty
hours a week without their voluntary consent to do so. Claimants were
compelled to work overtime on their daily shift, where they worked nearly
double shifts during the week, and they were compelled to work weekends.
All of this overtime and weekend work exceeded the forty hour work week.
All of this overtime work was involuntary. Defendant violated § (b) by
doing a prohibited act.

90. Defendant paid claimants only $2 an hour for overtime, which is
also way below the minimum wage and constitutes a third violation of the
Walsh Healey Act and the second time they failed to do a required act.

91. Under § (d) [41 U.S.C. § 35(d)] of the Walsh – Healey Act, the
buildings used for manufacturing goods are required to be non-hazardous
and sanitary, and there must be nothing unsafe about the working conditions.
Claimants were compelled to work in a building that was not adequately
ventilated and they were not issued the proper safety apparel specified by the
product safety data sheets used for manufacturing helmets. Defendants were
subjected to overexposure and repeated long term exposure of hazardous

vapors, mists and microscopic solid matter and are experiencing eye, skin, lung, kidney and neurological damage due to this long term proximity.

92. Defendants refused to do two acts required of them under the Walsh – Healey Act and they have done three overt acts prohibited by this law. The acts required but not performed consisted of: (1) paying $1 an hour for regular time instead of the minimum wage, and (2) paying $2 an hour for overtime instead of a wage above the minimum wage. The three overt acts prohibited consisted of requiring claimants to work in excess of 40 hours a week under duress, failing to provide a properly ventilated work area suitable for manufacturing the finished end product and failing to provide proper safety apparel to protect them from hazardous chemical ingredients.

**Claim 3 – Reckless Disregard for Welfare / Deliberate Indifference**

93. The torts *reckless disregard for the welfare of another* and *deliberate indifference* overlap one another. Because of this commonality, both types of torts are considered together as one claim.

94. The definition of *reckless disregard for the welfare of another* in Texas exceeds negligence and requires such want of care as to equate to gross negligence. In proving this claim, there is no requirement to prove any mental state of the person whose acts or omissions are subject to the claim. Reckless disregard for one's welfare can be proven externally by acts and

omissions and the readily foreseeable consequences flowing from those acts and omissions, leading up to and occurring at the time of the incident.[5]

95. *Deliberate indifference* is invoked to describe systemic deficiencies and can also be proven through external evidence either through an established pattern or by systemic deficiencies which make widespread suffering inevitable.[6] Like reckless disregard for another's welfare, deliberate indifference requires conduct more blameworthy than negligence.

96. Common sense and everyday experience informs us that you cannot compel a person to work from 7:30 a.m. to 9 p.m. without extracting a huge toll from them physically, emotionally and mentally. This inherently stressful situation is exacerbated by compelling them to work in a building that traps and holds hazardous chemical vapors and by not providing them with the safety apparel specified by the product safety data sheets. Finally, letting them return to a condemned building, where they are forced to drink contaminated water, take an ice cold shower and allowing less than an hour of time for their personal needs is calculated to keep them agitated and deprive them of time to heal.

---

[5] *See* Rice v. Schiller, 241 S.W. 2nd 330, 338 (Tex. App. 1951) "reckless disregard of the rights of others does not depend upon the actual mental state of the person whose acts or omissions are complained of, but is determined externally by his acts and conduct and the facts and circumstances in evidence before you leading up to and at the time of the accident in question." This authority has been overruled on another, unrelated matter. The point of law referenced herein has been cited and reaffirmed on several occasions.
[6] *See* Ruiz v. Estelle, 503 F. Supp. 1265, 1329 (D.C. Tex. 1980)

97. Throughout this time, there was no functioning sick bay or medical care available because the prison was closed and the medical care area in particular had sustained extensive water damage and mold infestation, necessitating  the fact that this had to be closed because it was in no state to pass inspection.

98. Subjecting anyone to this regimen is self evident proof of both deliberate indifference and a reckless disregard for their welfare.

### Claim 4 – Cruel and Unusual Punishment (as a Constitutional Tort)

99. Routine discomfort is part of the penalty that criminal offenders pay for committing crimes. Only those deprivations denying "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation." It is *obduracy and wantonness, not inadvertence or error in good faith* that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause …" [7]

100.   The Supreme Court has held that the Eighth Amendment's prohibition against cruel and unusual punishment will be violated if prison officials expose an inmate to a condition that poses an unreasonable risk to that person's future health.[8] This violates the Eighth Amendment because it

---

[7] Wilson v. Seiter, 501 U.S. 294, 298 – 299 (1991) [Emphasis in original text.]
[8] *See* Helling v. McKinney, 509 U.S. 25, 33 (1993) "I t is "cruel and unusual punishment to hold convicted criminals in unsafe conditions."

amounts to an unnecessary and wanton infliction of pain contrary to contemporary standards of decency. [9]

101. Allegations of contaminated water [10] and toxic fumes [11] have both been held to state an Eighth Amendment claim.

102. Claimants have been afflicted with a peculiarly unique set of diseases. The evidence is irrefutable that Hurricane Rita brought black mold into this prison and claimants' health has been seriously compromised by the damage of these spores to the lungs and the entire respiratory track. Morgellons disease was unknown until the hurricane's storm surge and powerful winds blew this man made material inland and contaminated the water. Just one of these diseases would be sufficient to make out an Eighth Amendment claim. The harm posed by both diseases is totally debilitating.

103. With regard to MRSA Staph and H. Pylori, both diseases are readily preventable. But with cold showers and a total absence of hygiene and sanitation in living quarters, compounded by a lack of medical care at the prison, it was inevitable that each disease would flourish and spread. Because these diseases are preventable, their wide-spread inflictions could

---

[9] *See* Helling v. McKinney, 509 U.S. 25, 32 (1993).
[10] See Jackson v. Arizona, 885 F. 2nd 639, 641 (9th Cir. 1989) and Jackson v. Duckworth, 955 F. 2nd 21, 22 (7th Cir. 1992).
[11] Johnson-Eli v. Schoemehl, 878 F. 2nd 1043, 1054-55 (8th Cir. 1989); Cody v. Hillard, 599 F. Supp. 1025, 1032 (D.S.D. 1984).

not occur, indeed necessitated deliberate indifference and a reckless disregard for the welfare of claimants.

104. Claimants have all suffered cruel and unusual punishment due to the contaminated water they were forced to drink, and the toxic chemical fumes they were forced to breath. Claimants were overexposed and repeatedly exposed to hazardous and toxic chemicals, and none of these dangers can be justified as furthering any justifiable penological purpose.

### Claim 5 - Malice

105. One definition for malice consists of reckless disregard of the law or of a person's legal rights. [12] Claimants are incarcerated. Their access to the law is limited. As a consequence of being incarcerated, it is defined by acts and just as indelibly by omissions of prison staff, who hold the power to give them full access, or no access, and any kind of access in between.

106. Prison staff employed a number of different  strategies, ranging from outright retaliation to subtle, below the radar screen forms of retaliation to discourage the filing of tort claims. An overt form of retaliation consisted of no longer letting a claimant work overtime once they found out they had joined this lawsuit. A more subtle form of retaliation consisted of giving them a new and much less desirable job. Sometimes, both forms were used.

---

[12] *See* Black's Law Dictionary, 8th Edition, online version, under "malice."

107. Once denial letters began circulating through the prison, the sacrifices made to pursue these claims no longer seemed worthwhile, given the attitude reflected in these denial decisions.

108. Through these practices, Defendant effectively discouraged the filing of tort claims until counsel came to their assistance. These acts and omissions were driven by a reckless disregard for the law and of claimant's legal rights, and constitute malice.

109. Plaintiffs request a trial before a Judge.

WHEREFORE, Plaintiffs request the following relief.

1. Issue an order adjudging and declaring the pre-requisites of the Federal Tort Claim Act and, in particular, the requirement imposed by 28 U.S.C. § 1346 (b)(2) [i.e. the physiological basis for a mental disorder] satisfied and further finding that Defendant is liable to claimants for damages.

2. Declare that Plaintiffs have proven all of the elements for negligence and that Defendant has in fact been negligent toward claimants.

3. Declare that Plaintiffs have proven violations of the Walsh Healey Act, paragraphs (a), (b) and (d), and that Defendant is liable for damages.

4. Declare that Plaintiffs have proven all elements for reckless disregard for the welfare of another and / or deliberate indifference, and that Defendant has in fact been reckless and deliberately indifferent toward claimants.

5.   Declare that Plaintiffs have proven all elements for proving the constitutional tort of cruel and unusual punishments and that Defendant has in fact arbitrarily and without good cause imposed cruel and unusual punishments upon claimants.

6. Declare that Plaintiffs have proven all elements for malice and that Defendant has in fact acted with malice toward claimants.

7. Declare that for all claimants, the measure of damages is $250,000 per claimant.

8. Find that counsel has taken this case on a contingency fee basis and is entitled to attorney fees as set forth in the Federal Tort Claim Act, up to but not exceeding 25% of the award granted to claimants. Plaintiffs further request reimbursement of litigation fees of a non-hourly nature, such as travel and expert witness fees.

9. A Trustee should be appointed to issue awards granted to claimants.

10. Claimants seek any other relief developed by the evidence and consistent with allegations pled herein, which is necessary, expedient or consequential to the relief herein requested.

Respectfully submitted;

/s/ Norman L. Sirak

_____

Norman L. Sirak
Ohio Reg.  OH0038058

4974 Higbee Ave.  – Suite 203
Canton, Ohio 44718
Phone (330) 493 – 7462
Fax (330) 493 – 7851
Email nsirak@parolereform.com